615 A.2d 1218

**Charles HEYDA**

v.

**Ivana B. HEYDA.**

No. 187, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Nov. 27, 1992.

David S. Goldberg, Rockville, for appellant.

No Brief or Appearance by appellee's counsel.

Submitted before ALPERT, BLOOM, and MOTZ, JJ.

ALPERT, Judge.

This is an appeal from a so-designated "Qualified Domestic Relations Order"[1] entered by the Circuit Court for Montgomery County. In their divorce proceedings, appellant, Charles Heyda, husband, and appellee, Ivana B. Heyda, wife, entered into a stipulation, which was placed on the record. The stipulation provided (1) that wife was to receive "survivorship" benefits in Charles' Civil Service Retirement System plan, and (2) that wife's interest in husband's pension and "survivorship" benefits was to be computed using the so-called *Bangs'* formula. The lower court, in interpreting the stipulation, but in contravention of federal regulations, granted wife (1) an interest in a Former Spouse Survivor Annuity, and (2) a conditional interest in an Insurable Interest Annuity. Also, the lower court did not properly apply the *Bangs'* formula. Finally, after reviewing the applicable (and recently enacted) federal regulations, we hold that the format of the trial court's order would be unacceptable to the Office of Personnel Management. Accordingly, we reverse and remand.

## BACKGROUND

On July 5, 1969, Charles Heyda ["Charles"] married Ivana B. Heyda ["Ivana"]. At all times relevant to this litigation—including throughout the entirety of his marriage to Ivana—Charles was (and remains to this day) a civilian employee of the United States government. As a federal employee, Charles is covered by the federal Civil Service Retirement System ["CSRS"]; the CSRS, in turn, is administered by the federal Office of Personnel Management

---

1. We note that, in designating its order as a "Qualified Domestic Relations Order," [a "QDRO"] the trial court engaged in a common, but unacceptable (to the federal government) practice. Properly used, the term "QDRO" describes an order issued by a state trial court under the Employees Retirement Income Security Act ["ERISA"], 29 U.S.C.A. 1001 *et seq.* The order in the case *sub judice* does *not* involve benefits under ERISA, but rather it involves benefits under the Civil Service Retirement System ["CSRS"], and hence it should not have been designated as a QDRO.

["OPM"]. The monthly annuity to which Charles, as a retired CSRS participant[2], will be entitled is based upon his number of years of federal government service and his earnings. Federal law permits state divorce courts to treat certain pension and retirement rights as marital property, 5 U.S.C.A. § 8345(j), and, correspondingly, Maryland has specifically authorized its trial courts to implement a monetary award by transferring a portion of a party's pension or retirement plan to his or her spouse. *See* Md.Code (1984, 1991 Repl.Vol.), § 8–205(a) of the Family Law Article.

Eventually Ivana sued Charles for divorce. The parties, with and through the assistance of counsel, negotiated and stipulated a property settlement; one of the terms of this stipulation concerned transferring a portion of Charles's federal pension, with survivorship benefits, to Ivana.

On August 15, 1989, the parties came before the Circuit Court for Montgomery County (Paul A. McGuckian, J.) to place their stipulation on the record. Louis J. Fiechtner, Esquire, represented Ivana at the hearing; Steven J. Bienstock, Esquire, represented Charles. The colloquy that is relevant to the case *sub judice* (in that it concerned Ivana's interest in Charles's pension benefits) was admittedly brief, to wit:

MR. FIECHTNER: * * * There is also a pension with the federal government of Mr. Heyda. Mr. Heyda has agreed to a division of the pension of 50% to his wife *with survivorship benefits.*

A domestic relations order dividing that pension, suitable for an if, as or when division, will be prepared and submitted to Counsel for his review and then ultimately submitted to the Court.

Mr. Heyda would waive any claims to Mrs. Heyda's pension, if—well, waive any claims to any pension rights she may have.

---

**2.** The term "participant" is used herein to describe a retiree from federal employment who participates in the CSRS pension system.

MR. BIENSTOCK: The 50 percent is to be computed during—for the duration of the marriage, from the marriage date until—

MR. FIECHTNER: Under the bank's [sic] formula [3].

MR. BIENSTOCK:—divorce, under the standard formula. The—

THE COURT: When is it due?

MR. BIENSTOCK: If, as and when.

MR. FIECHTNER: *And with survivorship rights.*

\*   \*   \*   \*   \*   \*

MR. BIENSTOCK: In addition, Your Honor, just to summarize, other than what is specified in [the testimony above], it is our understanding that Mrs. Heyda seeks nothing from Mr. Heyda and Mr. Heyda seeks nothing from Mrs. Heyda; that this is the totality of the agreement between the parties.   \* \* \* \*

(Emphasis and footnote added.) With respect to these pension issues, there is no other testimony that reflects the parties' intent. Nor does the record reflect an exchange of correspondence between the parties' counsel to guide the court as to the parties' intent. The above colloquy represents the totality of facts upon which the lower court had to base (1) its determination as to the parties' intended meaning of "survivorship rights" and "survivorship benefits," and (2) its determination as to the applicability of the *Bangs'* formula.

On January 18, 1990, the court *inter alia* granted Ivana an absolute divorce from Charles. As part of that judgment, the lower court ordered

that the provisions of the stipulation of the parties read into the record in open Court before the Honorable Judge Paul McGuckian on August 15, 1989, a transcript of which was introduced and admitted into evidence before

---

**3.** It is undisputed that Mr. Fiechtner was referring to the formula set forth in *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984) (hereinafter, the "*Bangs'* formula").

the Master on January 9, 1990 as Plaintiff's Exhibit # 2, be and the same are hereby incorporated, but not merged, in this judgment to the extent that the Court has jurisdiction, and it is further * * * *

ORDERED that this Court hereby reserves jurisdiction to enter a Qualified Domestic Relations Order to effect pension distributions pursuant to the agreement of the parties[.] [4] * * * *

(Footnote added.)

On June 28, 1991, Ivana filed a Motion for Entry of Qualified Domestic Relations Order. This motion was intended to implement the foregoing stipulation relative to Ivana's interest in Charles' pension distributions. Charles opposed the way Ivana had implemented the parties' agreement, however, and correspondingly requested a hearing to resolve the issue.

On September 19, 1991, the Circuit Court for Montgomery County heard arguments from the parties concerning four areas of the proposed "QDRO" that were then in dispute. Of these four areas, only two are at issue presently: (1) What did the parties intend when they agreed to provide Ivana with "survivorship benefits," and (2) Exactly how should Ivana's "survivorship annuity" be calculated?

Unfortunately, these two simply phrased, disputed issues must be resolved through the complex world of federal governmental organizational law and its corresponding OPM regulations. We shall reserve our discussion concerning the legal aspects of these issues for section A of this opinion, below. For our present purposes, however, it is

---

**4.** The phrase "Qualified Domestic Relations Order" ["QDRO"], as explained in footnote 1, above, was actually being used incorrectly. Nevertheless, the trial court used the phrase to refer to the OPM procedural requirement that, before a former spouse is entitled to a portion of a federal employee's retirement benefits, the precise terms of the former spouse's interest in those benefits must be set forth in a "qualifying [state] court order." *See* 5 CFR §§ 831.603, 831.1704. Notwithstanding the trial court's misuse of the phrase, when we refer to the trial court's order, we shall nevertheless (and for the sake of consistency) refer to it as a "QDRO."

sufficient to note that, pursuant to the aforementioned September 19, 1991 hearing, the lower court adopted Ivana's view of things; correspondingly, in its "QDRO" dated September 24, 1991, the circuit court *inter alia* ordered:

[I]n the ... event that [Charles] shall predecease [Ivana], [she] shall receive a Former Spouse [Survivor] Annuity, as defined in 5 C.F.R. Section 831.603; provided however, that in the event that [Ivana] is otherwise entitled to a Former Spouse [Survivor] Annuity pursuant to this paragraph ..., but is precluded from receiving a Former Spouse [Survivor] Annuity because she remarries prior to attaining age 55, it is hereby agreed that (i) [Ivana] shall be entitled to receive an Insurable Interest Annuity, as defined in 5 C.F.R. Section 831.603, and (ii) [Charles] hereby covenants and agrees that, upon the written request of [Ivana], he shall take whatever actions are needed to convert the Former spouse [survivor] annuity entitlement to an Insurable Interest Annuity. Nothing herein shall be construed to require [Charles] to pay for two types of survivor benefits at the same time for the benefit of [Ivana].

The Former spouse [survivor] annuity or the Insurable Interest Annuity, as the case may be, shall provide for payments equal to 55% of [Charles'] "self-only annuity" immediately prior to [Charles'] death, ... or, in the event that [Charles] dies prior to the commencement of such payments, 55% of the payments to which [Charles] would have been entitled if he had retired on the date of his death.

Charles now appeals from this "QDRO." Specifically, he has asked us to address two questions:

I.   Where the parties entered into a stipulation providing for Ivana to receive "survivorship" benefits in Charles' Civil Service Retirement System plan, did the lower court err in awarding Ivana both a Former Spouse Survivor Annuity and an Insurable Interest Annuity?

II.  Where the parties agreed that the formula for allocating Charles' retirement and survivor annuity benefits would be in accordance with the case of *Bangs v. Bangs*, 59 Md.App. 350 [475 A.2d 1214] (1984), did the lower court err in failing to apply the *Bangs'* formula to the survivor annuity benefit computation?

## LAW

### A.

#### *Former Spouse Survivor Annuities v. Insurable Interest Annuities*

██ Charles and Ivana placed their stipulation on record during the aforementioned August 15, 1989 hearing. Therefore, we start with the basic factual proposition that the lower court was asked to interpret the terms of this stipulation.  As we stated in *Bentz v. Mutual Fire, Marine & Inland Ins. Co.*, 83 Md.App. 524, 575 A.2d 795 (1990),

[t]he cardinal rule in the construction and interpretation of contracts is that effect must be given to the intention of the parties, unless it is inconsistent with some established principle of law.  All other rules of construction are simply in aid of that "cardinal rule."

*Id.* at 538, 575 A.2d 795 (citations omitted).

██ Moreover, as Charles properly contends, the parties to an agreement are deemed to have contracted with knowledge of existing law—in this case, the law concerning federal governmental pensions—and that (unless expressly rejected as inapplicable) such law becomes a part of the contract as though it were expressly referred to and incorporated into the agreement.  *See, e.g., Shell Oil v. Ryckman*, 43 Md.App. 1, 8–9, 403 A.2d 379 (1979).

As indicated above, the two simply phrased, disputed issues in this case must be resolved through the complex world of federal governmental organizational law and its corresponding OPM regulations (hereinafter, the "regulations").  As the record before us is silent as to whether the parties wished to reject this law as inapplicable, we therefore hold that such law applies to the agreement *sub judice*.

Accordingly, we may now phrase our present task more succinctly: we must determine whether the trial court erred as a matter of fact-finding when, in light of applicable law, that court found that Charles and Ivana had intended (1) to construe the phrase "survivorship rights" to include *both* a Former Spouse Survivor Annuity *and* an Insurable Interest Annuity, and (2) not to calculate Ivana's survivorship annuity pursuant to the *Bangs'* formula.

We therefore begin our analysis by laying some intellectual and definitional groundwork vis-a-vis Charles' federal government retirement benefits.

The regulatory computation of Charles' retirement benefits begins with his so-called "self-only annuity." The regulations define a self-only annuity as "the recurring payment to a retiree who has elected not to provide a survivor annuity to anyone." 5 C.F.R. § 831.1703. A self-only annuity may be distinguished from a "gross annuity," which the regulations define as "the amount of a self-only annuity *less only the applicable survivor reduction, but before any other reduction." Id.* (emphasis added). Therefore the mathematical relationship between a self-only annuity and a gross annuity is simple: a self-only annuity *minus* the applicable survivor reduction *equals* a gross annuity.

As is relevant here, there are two types of "survivorship" annuities that incur "survivor reductions" so as correspondingly to reduce a retiree's self-only annuity: these are the so-called "former spouse survivor annuity"[5] and the so-called "insurable interest annuity." We shall discuss them respectively.

The most basic type of survivorship annuity is the *former spouse survivor annuity*. The regulations define a former spouse survivor annuity as "a recurring benefit under

---

**5.** The "former spouse *survivor* annuity" has in the past been referred to simply as a "former spouse annuity." It is also sometimes referred to as the "survivor annuity."

CSRS that is payable to a former spouse after the employee's, Member's or retiree's death." *Id.* § 831.603. For our purposes, there are two significant "features" of a former spouse survivor annuity. First, federal statutory law, and the regulations promulgated pursuant thereto, expressly authorize a state trial court to order payment of a former spouse survivor annuity. *See, e.g.,* 5 U.S.C.A. § 8341(h)(1) ("[A] former spouse of a deceased employee ... is entitled to a [former spouse survivor annuity] if and to the extent expressly provided for ... in the terms of any decree of divorce or annulment or any court order or court-approved property settlement agreement incident to such decree"). *See also id.* § 8345(j); 5 C.F.R. 831.1704. Second, former spouse survivor annuity payments terminate under certain specified conditions. Specifically, a former spouse survivor annuity "shall terminate ... no later than the last day of the month before the former spouse remarries before becoming 55 years of age[, or when the former spouse dies]." 5 U.S.C.A. § 8341(h)(3)(B)(i). The following regulations reinforce Congress's intentions concerning the termination of former spouse survivor annuities:

> A former spouse survivor annuity or eligibility for a future former spouse survivor annuity terminates on the last day of the month before the month in which the former spouse remarries before attaining age 55.

5 C.F.R. § 831.625(b).

> If present or future entitlement to a former spouse survivor annuity is terminated because of remarriage of the recipient or potential recipient, the entitlement is permanently extinguished. An annulment of the remarriage does not reinstate the entitlement.

*Id.* § 831.625(d).

> OPM will terminate a recurring payment of or a future interest in survivor annuity benefits to a former spouse whenever ... the former spouse dies [or] remarries[.]

*Id.* § 841.908(b)(2).

> A current or former spouse survivor annuity under this subpart terminates on the last day of the month before

the current or former spouse remarries before age 55 or dies.

*Id.* § 843.304(b).

The parties hereto agree that the "QDRO" in the instant case properly provides that Ivana will receive a portion of Charles' retirement benefits from the date of his retirement until his death. *After Charles' death,* however, pursuant to both the "QDRO" and federal law, Ivana will also receive a *former spouse survivor annuity* so long as she lives and meets either of two conditions: (1) she does not remarry, or (2) she remarries after age 55. Such is the nature of a former spouse survivor annuity: it permanently terminates if the former spouse remarries *before* she turns 55.

In the case *sub judice,* the lower court, in determining what Charles and Ivana meant by the phrase "survivorship benefits," found that it was the parties' intention to grant to Ivana a former spouse survivor annuity that, pursuant to federal law and regulations, would permanently terminate if Ivana remarried before she turns 55. In construing the parties' intentions, however, the lower court also carried things a step further by finding that

> in the event that [Ivana] ... is precluded from receiving a Former spouse [survivor] annuity because she remarries prior to attaining age 55, it is hereby agreed that (i) [Ivana] shall be entitled to receive an *Insurable Interest Annuity,* as defined in 5 C.F.R. Section 831.603, and (ii) [Charles] hereby covenants and agrees that, upon the written request of [Ivana], he shall take whatever actions are needed to convert the Former spouse [survivor] annuity entitlement to an Insurable Interest Annuity.

(Emphasis added.)

The regulations define an *insurable interest annuity* as "the recurring payments under CSRS [made] to a retiree who has elected a reduction in annuity to provide a survivor annuity to a person with an insurable interest in the retir-

ee." 5 C.F.R. § 831.603.[6] With respect to insurable interest annuities, federal law provides as follows:

At the time of retiring under section 8336 or 8338 of this title, an employee or Member who is found to be in good health by the Office [of Personnel Management] may elect a reduced annuity instead of an annuity computed under subsections (a)–(i), (n), and (q) of this section and name in writing an individual having an insurable interest in the employee or Member to receive an annuity under section 8341(c) of this title after the death of the retired employee or Member. The annuity of the employee or Member making the election is reduced by 10 percent, and by 5 percent for each full 5 years the individual named is younger than the retiring employee or Member. However, the total reduction may not exceed 40 percent.

5 U.S.C.A. § 8339(k)(1).

Insurable Interest Annuities may be distinguished from Former Spouse Survivor Annuities in two relevant ways. First, unlike Former Spouse Survivor Annuities (which terminate if the former spouse remarries prior to 55 years of age), insurable interest annuities are terminated *only* upon the death of the recipient. *Id.* § 8341(c). Second (and more significant), the federal law relating to Insurable Interest Annuities differs materially from the law governing Former Spouse Survivor Annuities; the latter expressly authorizes payments of annuities pursuant to state court orders, while the former does not. That is, there are no federal provisions that are comparable to the above cited 5 U.S.C.A. §§ 8341(h)(1) and 8345(j), and 5 C.F.R. § 831.1704. In this regard, we find instructive 5 C.F.R. § 831, Subpart Q, Appendix B ("Guidelines for Interpreting State Court Or-

---

6. The "reduction in annuity," as such may apply to the instant case (i.e., assuming *arguendo* that the parties had agreed to provide an insurable interest annuity to Ivana), refers to the reduction in Charles' and Ivana's "gross annuity" benefits that will be paid to the parties from the time that Charles retires until his death. In other words, had the parties elected to provide to Ivana an insurable interest annuity, then, correspondingly, both of their "standard" (post-retirement, pre-Charles' death) pension benefits would be accordingly reduced.

ders Awarding Survivor Annuity Benefits to Former Spouses") [7]. This section provides as follows:

> Two types of potential survivor annuities may be provided by retiring employees to cover former spouses. [5 U.S.C.A. § 8341(h)] provides for "former spouse [survivor] annuities." [*Id.* § 8339(k)] provides for "insurable interest annuities." These are distinct benefits, each with its own advantages.
>
> A. OPM *will* enforce State court orders to provide section 8341(h) annuities. These annuities are less expensive and have fewer restrictions than insurable interest annuities but the former spouse's interest will automatically terminate upon remarriage before age 55. To provide a section 8341(h) annuity, the [state court] order must use terms such as "former spouse [survivor] annuity," "section 8341(h) annuity," or "survivor annuity."
>
> B. OPM *will not* enforce State court orders to provide "insurable interest annuities" under section 8339(k). These annuities may only be elected at the time of retirement by a retiring employee who is not retiring under the disability provision of the law and who is in good health. The retiree may also elect to cancel the insurable interest annuity to provide a survivor annuity for a spouse acquired after retirement.

(Emphasis added.)

There is one other regulatory section that may directly bear on the division of Charles' pension benefits. That section, 5 C.F.R. § 831.606 ("Election of Insurable Interest Annuity"), states in relevant part as follows:

---

**7.** The introduction to 5 C.F.R. § 831, Subpart Q, Appendix B states that

> These guidelines explain the interpretation that [OPM] will place on terms and phrases frequently used in awarding survivor benefits. These guidelines are intended not only for the use of OPM, but also for the legal community as a whole, with the hope that by informing attorneys, in advance, about the manner in which OPM will interpret terms written into court orders, the resulting orders will be more carefully drafted, using the proper language to accomplish the aims of the court.

A retiring employee or Member may not elect ... to provide a former spouse [survivor] annuity and an insurable interest annuity to benefit the same former spouse. *Id.* § 831.606(5)(i).

■ Above, we have set forth the intellectual and definitional groundwork vis-a-vis Charles' federal government retirement benefits; we now return to the facts of the case *sub judice.* As discussed above, we are asked to interpret the parties' stipulation that was read into the record on August 15, 1989. That stipulation makes no reference to either a Former Spouse Survivor Annuity or an Insurable Interest Annuity; the stipulation merely (and vaguely) refers to "survivorship benefits," "survivorship rights," and the "bank's [sic] formula." As we also mentioned above, an Insurable Interest Annuity can only be elected at the time of retirement, requires the participant to pass a physical exam, and—most significantly—a state court order regarding it will not be honored or enforced by OPM.

Moreover, since an Insurable Interest Annuity may only be elected at the time of retirement, 5 C.F.R. § 831.606(d), if Charles retires before Ivana reaches age 55, and if at that time Ivana has not yet remarried, then Charles—to protect himself from exposure to liability[8]—would be in the position of having to elect *both* types of annuities, despite such an action being contrary both to federal regulations (*see, e.g.,* 5 C.F.R. § 831.606(5)(i)) and to the lower court's "QDRO."

Considering the paucity of testimony in the record, when measured in the light of applicable law, the record does not provide sufficient evidence to enable the lower court to have ordered Charles to provide to Ivana an Insurable Interest Annuity as an alternative contingency to Ivana's being precluded from receiving a Former Spouse Survivor Annui-

---

**8.** Pursuant to the QDRO, Charles covenanted that he shall take whatever actions are needed to convert the Former Spouse Annuity entitlement to an Insurable Interest Annuity. It is beyond dispute that therefore Charles must elect the Insurable Interest Annuity at the time of his retirement in order to comply with the QDRO.

ty because she remarries prior to attaining age 55. Consequently, the lower court erred in awarding Ivana an interest in both types of annuities.

### B.

### *The Bangs' Formula*

■ As discussed above, it is undisputed that the parties intended both the retirement annuity and the "survivorship" benefits payable to Ivana to be computed in accordance with the so-called *Bangs'* formula, *i.e.*, the formula set forth in *Bangs*, 59 Md.App. at 350, 475 A.2d 1214.[9] The *Bangs'* formula computes the spouse's share of the participant's pension as follows:

> [The spouse in *Bangs* was awarded] a future sum or sums of money equal to a fractional share of [the participant's] retirement pension if, as and when he receives it. The fractional share payable to [the spouse] out of each pension payment [that the spouse] receives is: one-half of a fraction of which the number of years and months of the marriage ... is the numerator and the total number of years and months of employment credited toward retirement is the denominator:
>
> $$\frac{1}{2} \times \frac{\text{years and months of marriage}}{\substack{\text{total years of employment} \\ \text{[computed in months]}}}$$

*Id.*, 59 Md.App. at 356, 475 A.2d 1214.

The record clearly reflects that the parties agreed that the numerator of the above fraction would be 246.466 months. Accordingly, we hold that Ivana shall be entitled to a fractional share of both (1) Charles' pension if, as and when he receives it, and (2) the appropriate survivor annuity

---

**9.** As indicated above, the record reflects that Mr. Fiechtner, as counsel for Ivana, indicated that Ivana's interest in Charles' pension would be computed under the "bank's formula." At the September 19, 1991 hearing on the wording of the QDRO, counsel for Charles contended, without objection from Ivana's counsel, that the parties' clearly were referring to the *Bangs'* formula. (E. 31, 33–42.) We accept that contention, and thus are compelled to apply that formula here.

benefits.[10]  Pursuant to the *Bangs'* formula, the fractional share payable to Ivana out of each of Charles' pension and/or survivor annuity payments may be stated as follows: one-half of the total monthly payment to which Charles (or his survivor beneficiaries) may be from time to time entitled, multiplied by a fraction of which 246.466 is the numerator and the total number of years and months of employment credited toward Charles' retirement is the denominator:

$$\frac{1}{2} \times \frac{246.466}{\text{total months of employment}}$$

To the degree that the lower court deviated from this formula, it erred.

### DIRECTIONS ON REMAND

In accordance with this opinion, we remand this case to the circuit court for reconsideration of a single issue, to wit:  the circuit court should conduct a hearing for the limited purpose of permitting the parties to produce evidence of their intent in granting "survivorship" benefits in Charles' pension to Ivana.  In determining the parties' intent, the circuit court should *carefully* consider the limitations imposed by the federal government on a state court's power to pass an order affecting a Former Spouse Survivor Annuity and/or an Insurable Interest Annuity.  Moreover, and also in accordance with the text of this opinion, once the circuit court determines the *type* of survivorship benefit that the parties intended to bestow on Ivana, that court shall compute Ivana's share of Charles' pension benefits pursuant to the *Bangs'* formula as set forth herein.

Finally, we call to the trial court's attention the fact that OPM has recently revised its regulations regarding state court orders that affect retirement benefits.  *See* 5 C.F.R. Parts 831, 838, 841–43.  The new regulations are designed

---

**10.**  By "appropriate," we mean whatever survivor annuity benefits that the trial court, on remand, determines that the parties agreed to grant to Ivana.

to "make it easier for people to submit orders that will be acceptable to OPM." *See* 57 Fed.Reg. 120 (1992). The new regulations, however, clearly specify that "[t]he [state] court is also responsible for issuing orders that conform to the statutory and regulatory requirements." *See id.* at 122. In that regard, we call the circuit court's particular attention to 5 C.F.R. § 838.302 which "clarifies that court orders that contain language that make it impossible for [OPM] to process the court order while maintaining [their] ministerial role are not acceptable for processing." *Id.* at 124. In particular, section 838.302(a) defines as unprocessable all court orders labeled "qualified domestic relations order."

JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.